IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARIO L. LUTHER and        )
  MARIO LUTHER, INC.,       )
                            )
        Plaintiffs,         )
                            )   Civil Action No. 08-386
        vs.                 )
                            )
KIA MOTORS AMERICA, INC.,   )
                            )
        Defendant.          )

**MEMORANDUM OPINION**

Pending before the Court is a motion for summary judgment pursuant to Fed. R. Civ. P. 56, filed by Defendant Kia Motors America, Inc. ("Kia"), at Doc. No. 82.   For the reasons stated below, Defendant's motion is granted.

I.   **BACKGROUND**

A.   <u>Factual History</u>[1]

Mario Luther ("Mr. Luther") is the sole shareholder and officer of Mario Luther, Inc. ("Luther, Inc."), a Pennsylvania corporation located in Homer City, Indiana County, Pennsylvania. In April 2007, Mr. Luther was contacted by representatives of Kia Motors America, Inc.,[2] to discuss the possibility of becoming a Kia vehicle franchisee. (Amended Complaint, Doc. No. 34, "Am. Compl.,"

---

[1]  Unless otherwise noted, the facts in this section are not in dispute.  *See* Doc. Nos. 84 and 87, Concise Statements of Undisputed Facts filed by Defendant and Plaintiffs, respectively.

[2]  Kia Motors America, Inc., is a California corporation with its principal place of business in Irvine, California.

¶ 4.)  A regional manager of Kia met with Plaintiffs later in April in Homer City and the parties continued to discuss the possible franchise for several months.  (<u>Id.</u>, ¶¶ 5-6.)  The agents stated that in order to determine if Plaintiffs would be offered a Kia franchise in the Indiana/Blairsville market area, Mr. Luther needed to provide confidential information concerning sales and customer satisfaction related to his other dealerships as well as other information about his finances and assets.  As requested, Mr. Luther provided this information.  (<u>Id.</u>, ¶ 7.)

On June 28, 2007, Mr. Luther signed a five-page document[3] entitled "Application for Kia Sales and Service Agreement."  (*See* Defendant's Appendix to Motion for Summary Judgment, Doc. No. 85, "Def.'s App.," Exhibit A, "Kia Application.")  In that document, Mr. Luther, as Applicant, agreed as follows:

> Kia's issuance of this application form to applicant or the retention of a completed form does not in any way imply Kia's approval of the application. . . .

> This application does not in any way obligate Kia to enter into a Kia Dealer Sales and Service Agreement with me [Mr. Luther] or my proposed dealership entity.[4]  Upon its review of my application package, Kia may accept or reject my application in its sole discretion.

---

[3]  Although referred to in the text as a five-page document, the exhibit provided consists of only two pages.  The parties agreed that financial and other personal information pertaining to Mr. Luther would be redacted from the record in this case.

[4]  In the application, the "proposed dealership entity" was identified as MCDL, Inc., which was not incorporated until September 18, 2007.  (Plfs.' App., Exhibit A.)  MCDL, Inc., is not a party to this suit.

Any actions taken, expenditures made, or commitments assumed by me or an entity affiliated with me, whether relating to real estate, leases, or otherwise, shall be at my sole risk and responsibility without any liability whatsoever on the part of Kia or its representative.

No act, other than the written execution of a Kia Dealer Sales and Service Agreement by an Executive Officer of Kia shall constitute approval of this application by Kia.

No representations or statements by Kia or its representatives have been made to me or any person or entity affiliated with me which induced me to execute this application, nor have any representations or statements been made which would in any way indicate the action which Kia intends to take on this application.

(Kia Application, ¶¶ 1-4, 7.)

On August 1, 2007, Mr. Luther, along with two other candidates who were being considered for the Kia franchise in the Indiana/ Blairsville area, met with Barbara Robinson, a market representation manager from Kia's Eastern Region. On August 10, 2007, Ms. Robinson telephoned Mr. Luther to discuss the application for becoming a franchisee. As Mr. Luther recalls the conversation, Ms. Robinson him she had discussed the application with Michael Tocci, the Kia Eastern Region Director, and "the decision was made that we were the people that were going to be the Kia dealer in this market area." (Plaintiffs' Appendix, Doc. No. 88, "Plfs.' App.," Exhibit B, Deposition of Mario Luther, "Luther Depo.," at 104-105.) Mr. Luther understood that Kia's national office would have final approval of his dealership application, but had been assured by Ms. Robinson that such approval was only a "formality." (Id. at 110-111.) She also told Mr. Luther he would soon receive

3

some paperwork he needed to return as soon as possible because there was a deadline for getting financial assistance for constructing a new Kia dealership facility. (Id. at 103-108.)

Ms. Robinson, on the other hand, testified that the purpose of the August 10 conversation was to request the necessary documentation from Mr. Luther showing he was qualified in terms of capital, facility requirements and customer satisfaction ability. (Def.'s App., Exhibit E, Deposition of Barbara Robinson, "Robinson Depo.," at 59.) She further recalled that although she told Mr. Luther he had been selected as the candidate the Eastern Region office would propose to Kia headquarters, she never told him he would be a Kia dealer because she did not have the authority to make such a commitment. (Id.)

Mr. Luther followed up the same day with letters to Ms. Robinson and Mr. Tocci. In the letter to Mr. Tocci, Mr. Luther wrote that he understood completing the application process was the "first step to becoming a Kia dealer." He also stated that his application would be completed "in the time frame outlined" and it was his "sincere hope that it will receive the acceptance at the National level." (Def.'s App., Exhibit D, Luther Depo. at 114-115, and Def.'s App., Exhibit F.)

Also in August, Ms. Robinson spoke with Karen Holby, the controller for Luther, Inc. Ms. Holby stated at her deposition that although Ms. Robinson never told her Mr. Luther's application

4

had been approved by the regional office or that it would be approved by the national office, she did say that "in the past, approval at regional meant success at national.  She informed me that I should move forward, her exact words, to form [MCDL, Inc.] and to send in to Kia any additional information that they had requested."  Ms. Holby also testified that after this conversation, she called the company's attorney to form the new corporation "because I felt at that point we were moving forward and we were the Kia dealer."  (Def.'s App., Exhibit G, Deposition of Karen Holby, at 27 and 37.)

In response to e-mail communications from Ms. Robinson, Mr. Luther submitted additional materials to the Eastern Region office so she in turn could submit them to the national office by the end of August.  Among the materials he submitted was a "Kia Image Facility Assistance Program" application, the documentation necessary for him to get financial assistance to build a new facility for the franchise.  He also submitted a "Dealer Applicant Information Sheet" which provided details about the ownership of the potential franchise, the person designated to execute Kia documents, contact information regarding the location of the dealership, and the number of Kia vehicles to be sold at the new dealership. (Plfs.' App., Exhibits E-1 through E-19.)  In the next few weeks, Mr. Luther completed and submitted numerous other

5

documents as part of the dealer package.[5]  Plaintiffs also provided

a check in the amount of $15,000 to Kia on or about September 18,

2007, as a deposit for signage that would be used at the new

franchise location.    (Am. Compl., ¶ 17.)    According to Ms.

Robinson's deposition testimony, none of the other potential Kia

dealership candidates in the area was asked to complete any of

these documents or provide a signage deposit check. (Plfs.' App.,

Exhibit E, Robinson Depo., at 99-114.)

On October 23, 2007, Mr. Luther met with Mr. Tocci to discuss

his Kia dealership application.  Mr. Luther understood at the time

that contrary to prior representations, he was merely one of

several candidates in the area who were being considered for the

franchise. (Def.'s App., Luther Depo. at 150.)   According to Mr.

Tocci's deposition testimony, at least two "red flags" were

detected in the application materials submitted by Mr. Luther - the

ratio of new to used vehicles sold at two of his other dealerships

_____

[5]  These documents included a Business & Operating Plan, Dealer
Advertising Plan, Dealer Order Form, Automated Deposit and Payment
Processing Authorization, Authorization to Cash Draft, Dealer
Identification Participation & Property Access Agreement, Showroom
Merchandising Program Order Form, New Retailer Initial Training Fee &
Retail Training Subscription Charge, Parts Locator Program Enrollment
Form, Data Access Authorization Form, Service & Parts Equipment
Standards Form, 2007 Parts Information Subscription & Change Form, a
form committing Mr. Luther to purchase a "communications package"
which would allow his dealership to communicate with Kia, Uniform
Sales and Use Tax Certificate, Electronic Financial Statement
Submission, Warranty Labor Rate Market Analysis, Lemon Law Prevention
Policy and Procedures Acknowledgment, and a "proforma" document
outlining the number of vehicles to be sold, revenues and expenses for
the first three years of operation.  (Plfs.' App., Exhibits E1-E19.)

and customer satisfaction information from those locations.
(Def.'s App., Exhibit B, Deposition of Michael Tocci, at 80-81 and
137-138.)  Mr. Tocci therefore did not sign off on Mr. Luther's
dealership application and declined to submit the package to Kia's
national office for approval.  Sometime thereafter, Mr. Luther
learned that a competitor had been awarded the Kia franchise for
the Indiana/Blairsville market area.

    B.   Procedural History

      Plaintiffs filed suit in the Court of Common Pleas of
Indiana County, Pennsylvania, on February 25, 2008; the case was
timely removed to this Court on March 18, 2008, pursuant to 28
U.S.C. § 1332(a) based on complete diversity of the parties and an
amount in controversy greater than $75,000.  Defendant then moved
to dismiss the case under Federal Rule of Civil Procedure 12(b)(6);
the motion was denied without prejudice on June 12, 2008.  (Doc.
No. 12.)  Following unsuccessful mediation, Plaintiffs filed an
amended complaint in which they first alleged that Defendant
breached an oral contract to grant them a Kia franchise, despite
Plaintiffs having fulfilled all the prerequisite obligations
thereof.  In Count II, Plaintiffs claimed that on August 10, 2007,
Mr. Luther entered into an oral contract with a Kia representative
under which that representative promised to submit the franchise
application to Defendant's national office for approval, but
subsequently breached the agreement by failing or refusing to do

so.  Plaintiffs further alleged in Count III that during August and September 2007, Kia employees represented to Plaintiffs that they "had been selected for and/or had been granted a Kia Franchise" (Am. Compl. ¶ 33), and induced Plaintiffs to act on that representation which the Kia employees knew or should have known at the time to be false.  In Count IV, Plaintiffs alleged that Kia employees falsely misrepresented that Plaintiffs' application would be submitted to the national office for approval and Plaintiffs justifiably relied on those material misrepresentations to their detriment.  Finally, in Count V, Plaintiffs alleged that at the direction of Kia employees, they expended significant time and effort in such activities as establishing the new corporation, paying for Kia signage, and completing the comprehensive dealer package, again to their detriment.

Following extensive discovery, Defendant filed the now-pending motion for summary judgment.  The parties having fully briefed their positions, the matter is ripe for decision.

## II.  JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332.  Venue is appropriate in this court inasmuch as a substantial part of the events which are alleged to have injured Plaintiffs occurred in this district.  28 U.S.C. § 1391(b)(2).

## III. STANDARD OF REVIEW

"A court may grant summary judgment if, drawing all inferences

8

in favor of the nonmoving party, 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009), *quoting* Fed. R. Civ. P. 56(c). The "mere existence" of disputed facts will not result in denial of a motion for summary judgment; rather there must be "a genuine issue of material fact." Am. Eagle Outfitters, id., *quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, id. at 248.

The moving party has the initial burden of showing the absence of a genuine issue concerning any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once that hurdle is crossed, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 257. While all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, the nonmoving party may not rely on mere conclusory allegations or denials taken from the pleadings once the moving party has presented evidence to refute those allegations. Schoch

v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).

In considering a motion for summary judgment, the court is not to weigh the evidence or determine the truth of the matter, but ascertain only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Am. Eagle Outfitters, 584 F.3d at 581, citing Liberty Lobby, id. at 248-249. The court is "required to review the record and draw inferences in a light most favorable to the nonmoving party, . . .yet the nonmoving party must provide admissible evidence containing 'specific facts showing that there is a genuine issue for trial.'" Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 379 (3d Cir. 2005), quoting Fed. R. Civ. P. 56(e).

**IV. LEGAL ANALYSIS**

    A.    <u>Counts I and II – Breach of an Oral Contract</u>

Counts I and II of the Amended Complaint are parallel claims, the first alleging that Kia, through Barbara Robinson, orally contracted to grant Plaintiffs a Kia franchise and the second alleging that she orally contracted with Mr. Luther to submit Plaintiffs' franchise application to the company's national office. These contracts were subsequently breached when the regional office failed or refused to forward Plaintiffs' dealer package and Kia awarded the franchise to another party. (Am. Compl., ¶¶ 22-31.) In the brief in support of its motion for summary judgment, Kia sets out five arguments why these claims must

fail:

- In the Kia Application signed by Mr. Luther on June 28, 2007, the parties expressly agreed that "[n]o act other than the written execution of a Kia Dealer Sales and Service Agreement by an Executive Officer of Kia shall constitute approval of this application by Kia."  Mr. Luther read, understood and signed this application but the Sales and Service Agreement was never executed. Therefore, no contract ever existed between Kia and Mr. Luther.  (Memorandum of Law in Support of Motion for Summary Judgment, Doc. No. 83, "Def.'s Memo," at 2-3.)

- Plaintiffs cannot establish that an oral contract existed, i.e., that there was an offer, an acceptance, consideration and a mutual meeting of the minds.  The discussions between Ms. Robinson and Mr. Luther involved alleged promises on her part (i.e., that MCDL, Inc., would be the new Kia dealership in the area and that the regional office would forward the application to national headquarters) which were so indefinite as to be unenforceable.  (Def.'s Memo at 4-7.)

- Plaintiffs' claims are based solely on statements allegedly made by Barbara Robinson.  Even if those statements were made (which Ms. Robinson denies), she had no authority to bind the corporation and thus, such statements cannot give rise to a breach of contract claim against Defendant.  (Def.'s Memo at 7-8.)

- Plaintiffs suffered no damages because MCDL, Inc., rather than Mr. Luther or Luther, Inc., was the legal entity proposed to hold the Kia franchise; moreover, neither Plaintiff can recover on behalf of MCDL, Inc.  (Def.'s Memo at 8-9.)

- With regard to the alleged promise by Ms. Robinson to forward the application to Kia's national office, even if such an oral contract existed, Plaintiffs suffered no damages as a result of the alleged breach because the decision to accept MCDL, Inc., as a Kia dealer was reserved solely to the national office.  (Def.'s Memo at 9-10.)

Plaintiffs argue that contrary to Defendant's position that the Kia Application signed on June 28, 2007, precludes an oral

agreement between the parties, that document is not a contract, is not enforceable because it is not supported by consideration, and is a boilerplate document drafted by Kia without negotiation and with terms which are clearly unreasonably favorable to Kia. (Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, Doc. No. 86, "Plfs.' Memo," at 2-3.) Second, even if the application did create an agreement between the parties, Defendant's subsequent promises, representations, and conduct worked a modification or waiver of its terms. For example, the instructions from Kia to Mr. Luther regarding forming a new corporation, establishing a trade name, developing a business plan, and other demands show that Kia assented to such modification or waiver of the terms of the original application. (Id. at 3-4.)

Plaintiffs further argue that under Pennsylvania law, the question of whether an oral contract existed is an issue of fact, therefore the case must proceed to trial. (Plfs.' Memo at 4-5.) Moreover, contrary to Defendant's position, the terms of the oral contracts are sufficiently definite so as to be enforceable. The terms of the agreement between the parties are readily ascertainable from the documents and forms Plaintiffs submitted to Defendant; where any necessary terms are not established by those documents and the negotiations between the parties, the jury could rely upon the standard provisions of the Kia Dealer Sales and Service Agreement or terms commonly accepted in the automobile

dealership industry. (<u>Id.</u> at 5-6.)

Finally, the Court should reject Defendant's position that Mr. Luther and Luther, Inc., did not suffer any damages because of the failure to submit the application to national office or grant the dealership. All the promises and representations were made to Mr. Luther or employees of Luther, Inc., who were therefore the parties injured when Defendant failed to perform under the oral contracts. (Plfs.' Memo at 6.)

1. *Applicable Law:* To state a claim for breach of contract under Pennsylvania law, a plaintiff must establish: "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract and (3) resultant damages." <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 225-226 (3d Cir. 2003), *quoting* <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). When alleging breach of an oral contract, the burden of proving the existence of the contract is on the plaintiff. <u>Taylor v. Creditel Corp.</u>, CA No. 04-2702, 2004 U.S. Dist. LEXIS 25149, *18 (E.D. Pa. Dec. 13, 2004), *see also* <u>Mackay v. Mackay</u>, 2009 Pa. Super. LEXIS 4463, *9 (Pa. Super. Ct. Nov. 13, 2009) (where "a party seeks to enforce a disputed oral agreement, it is incumbent upon that party to establish the essential terms and conditions that constitute the enforceable agreement.") The evidence supporting the existence of such an oral contract must be "clear and precise." <u>Martin v. Safeguard Scientifics, Inc.</u>, 17 F.

13

Supp.2d 357, 368 (E.D. Pa. 1998). "In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." <u>Mountain Props. v. Tyler Hill Realty Corp.</u>, 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001) (internal quotation omitted.) "Unambiguous terms of a contract are construed by a court as a matter of law." <u>Lapio v. Robbins</u>, 729 A.2d 1229, 1232 (Pa. Super. Ct. 1999) (citation omitted.)

2.   *Discussion and Conclusion:* In this portion of our analysis, we must consider separately the two statements allegedly made by Ms. Robinson and reflected in Counts I and II of the Amended Complaint. We begin with Count II, the claim that Ms. Robinson told Mr. Luther his application would be submitted to the national office. At his deposition, Mr. Luther testified concerning his telephone conversation with Ms. Robinson on August 10, 2007,

> what she had said. . .to myself and. . .some other people, that when she spoke to me about this, that that was a foregone - I mean, that was a formality. That all of the work that was done here on the regional level was combed over pretty cautiously, and then it goes up to the national for them to sign off on it. That's what my understanding had been the whole time.

(Plfs.' App., Luther Depo. at 110-111.) He also testified with regard to the two-step approval process,

> What I understood it to be was that the regional office had to approve it before anybody else and that it was a

14

formality to send it up to the national level to sign off
on the recommendation of the regional office.

(Plfs.' App., Luther Depo. at 115.)

If we assume for sake of argument that Mr. Luther's testimony
provides "clear and precise evidence" concerning the terms of the
August 10, 2007 oral contract as he understood them, the contract
anticipated that (1) the regional office would "comb over" the
application "pretty cautiously," and the application would then be
submitted it to the national office "to sign off on it;" and (2) it
was a "formality" for the regional office to send the approved
application to the national office for further approval.   The
problem with Plaintiffs' argument that Kia breached the oral
contract on this point is that when the regional office "combed
over" their application, it was *not* approved.

Had the regional office failed to review the completed
application or if it had approved the application but failed to
forward it to the national office, Plaintiffs' breach of contract
argument might carry more weight.   But according to Mr. Luther's
testimony, the terms of the contract included a provision that the
application would be approved at the regional level before it was
sent to national headquarters.   Since the application was not
approved, Kia could not have breached the agreement by refusing to
send it to the national office.   Any other understanding of the
agreement, e.g., that the completed dealer package would be
approved regardless of its content, would contradict Mr. Luther's

15

understanding that it would be "combed over. . .pretty cautiously."

As for the second breach of contract claim, i.e., that Kia breached its agreement that as of August 10, 2007, Plaintiffs had been granted the Kia franchisee in the market area or, at a minimum, had been selected to receive a franchise, such a claim is contradicted by the letters Mr. Luther wrote to Mr. Tocci and Ms. Robinson the same day.  Mr. Luther testified that in the telephone call between himself and Ms. Robinson on August 10, 2007, she told him that between August 1 and August 10, she had

> sat down, reviewed the numbers with Mike Tocci and that
> they had [made] the decision that we were the people that
> were going to be the Kia franchise in this market area.

(Plfs.' App., Luther Depo. at 108.)

However, in a letter to Mr. Tocci, he wrote:

> . . . .I realize that this is the first step in becoming
> a KIA dealer and I appreciate the fact that you have
> given me your support in this effort. Our application
> will be completed in the time frame outlined and it is
> our sincere hope that it will receive the acceptance at
> the National level.[6]

(Def.'s App., Exhibit F-1.)

To Ms. Robinson he wrote:

> . . . .I realize that this is the first step in becoming
> a KIA dealer and I appreciate the fact that you have
> given me your support in this effort. . . .We will have
> all documents completed for your review and final
> submission to the National level within the time frame

---

[6] The latter part of this sentence also provides evidence that Mr. Luther understood that acceptance at the national level was not just a "formality" but the critical factor in being awarded the franchise.

discussed.

(Def.'s App., Exhibit F-2.)

We find the phrase "first step in becoming a Kia dealer" to be inconsistent with Plaintiffs' allegations that Mr. Luther believed he had already been awarded the Kia franchise.  We also find that taken together with the acknowledgment that awarding the franchise was a two-step process involving approval at both the regional and national levels, this statement belies any oral contract between the parties that Plaintiff had been selected to receive the franchise prior to being approved at both levels.  In fact, these written comments are consistent with Ms. Robinson's testimony that in the conversation on August 10, 2007, she told Mr. Luther he and his company had been selected from among several contenders not as the franchisee, but as the parties the regional office would support in completing the dealer package necessary to acquire the franchise.   (Def.'s App., Robinson Depo. at 59; "He had been selected to be the candidate that we were moving forward with.")

We conclude the surrounding circumstances and course of dealing between the parties shows that if in fact the parties entered into an oral contract concerning the claims in either Count I or Count II, the terms of that contract were not breached when Kia declined to forward the dealer package to national headquarters or failed to award the franchise to Plaintiffs.  Summary judgment is therefore  entered in favor of Defendant on Counts I and II of

the Amended Complaint.

B.    Counts III and IV - Negligent Misrepresentation

Defendant argues Plaintiffs cannot maintain a claim for negligent misrepresentation with regard to either purported promise because Mr. Luther signed the Kia Application in which he acknowledged that the only way his application would be accepted was with the approval of a Kia executive officer in the Dealer Sales and Service Agreement ("Dealer Agreement.")  Therefore, his claim of justifiable reliance on the representation that Plaintiffs had been selected to receive or had been granted a Kia franchise and the representation that their application would be submitted to the national office for approval must fail.    This lack of justifiable reliance is evidenced in the letter to Mr. Tocci in which Mr. Luther stated that he understood he had taken the "first step" to becoming a Kia dealer.  Finally, as in the previous claims for breach of an oral contract, neither Plaintiff sustained any damage as a result of actions they took in reliance on the misrepresentations because those actions were taken on behalf of the new entity, MCDL, Inc.   (Def.'s Memo at 10-12.)

Plaintiffs argue that the question of whether reliance was justifiable is generally deemed to be a question of fact for the jury, consequently summary judgment may not be entered on this claim.  Because Plaintiffs have provided evidence of justifiable reliance on the oral promises and representations made by

18

Defendant, the motion must be denied.  (Plfs.' Memo at 7-8.)

      1. *Applicable Law:* In its negligent misrepresentation jurisprudence, Pennsylvania has adopted section 552 of the Second Restatement of Torts, which reads in pertinent part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See* Bilt-Rite Contrs., Inc. v. Architectural Studio, 866 A.2d 270, 273, n.1 (Pa. 2005); Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999).

      "Negligent misrepresentation requires proof of: (1) misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known of its falsity; (3) with an intent to induce another to act on it and (4)which results in injury to a party acting in justifiable reliance on the misrepresentation." Bortz, *id.* The plaintiff must also establish that the negligent misrepresentations were the proximate cause of his injuries.  Joyce v. Bobcat Oil & Gas, Inc., CA No. 07-1421, 2008 U.S. Dist. LEXIS 27181, *42 (M.D. Pa. Apr. 3, 2008), *citing* Gibbs v. Ernst, 647 A.2d 882, 891 (Pa. 1994).  A defendant is liable only for those injuries suffered by a plaintiff who justifiably relied on the information and whose reliance the defendant could have reasonably foreseen. Sonecha v. New Eng. Life Ins. Co., No. 04-1448, 2005 U.S. App. LEXIS 4754, *5 (3d Cir. Mar.

23, 2005), *citing* Bilt-Rite, 866 A.2d at 287.

      2.   *Discussion and Conclusion:*  As in the previous section, we conclude that contemporaneous evidence, i.e., the letters to Mr. Tocci and Ms. Robinson, supports the conclusion that Mr. Luther knew that the dealer package had to be approved at both the regional and national level before he could be awarded the Kia franchise in the Indiana/Blairsville market area, contrary to his claims that Ms. Robinson negligently misrepresented to him that the franchise had been awarded or that he had been selected to receive the franchise.  We find additional support for our conclusion in Mr. Luther's deposition testimony that he had read the Kia Application provisions and understood that (1) completion of the application did not imply approval by Kia; (2) the application did not obligate Kia to enter into the Dealer Agreement; and (3) that the only method by which a franchise was awarded was the execution of a Dealer Agreement by a Kia "executive officer."  Mr. Luther further testified that he was never told that the provisions of the Kia Application did not apply to him or that awarding the franchise would be done in a manner different from what was outlined therein.[7]  (Def.'s App., Luther Depo. at 111-112.)

------

    [7]  Defendants argue that Mr. Luther also testified he had understood the relevant provisions and did not find them confusing. Plaintiffs counter that Mr. Luther actually agreed that he could understand the provisions of the Kia Application and did not find them confusing "as you sit here today."  (Def.'s App., Luther Depo. at 112.)  There is no evidence in the record that Mr. Luther did not understand the Kia Application or found it confusing in August-September 2007.

This testimony and the letters make it clear that Mr. Luther understood, at least as early as August 10, 2007, and before he undertook any efforts to complete the full dealer package, incorporate a new Kia entity, or provide a deposit for signage, that his application package had to be approved at the regional level before it would be forwarded to the national office.  His application was never approved because it raised two "red flags" in Mr. Tocci's mind - the ratio of used to new cars sold and customer satisfaction ratings at Mr. Luther's other dealerships.  We find no reasonable jury could conclude that Mr. Luther justifiably believed his application would be submitted to Kia national headquarters despite the fact that it had not passed muster at the regional office.

Moreover, Plaintiffs have failed to identify - except in the vaguest of terms - the actions they took (or did not take) as a result of these alleged misrepresentations. In the Kia Application, Mr. Luther acknowledged that "any actions taken, expenditures made, or commitments assumed" by himself, Luther, Inc., or MCDL, Inc., would be at his "sole risk and responsibility without any liability whatsoever on the part of Kia or its representative."  There is neither deposition testimony nor an affidavit from Mr. Luther stating, for example, that he completed the dealer package, submitted the signage check, and incorporated the new Kia entity only because he believed, based on his conversation with Ms.

Robinson on August 10, 2007, that receiving the dealership was a *fait accompli*. Conversely, there is no evidence he would not have taken those same steps if he had been told only that Kia had selected him as the candidate who would be assisted by the regional office in completing the dealer package. Nor is there any evidence that the "demands" made upon Plaintiffs were more onerous than the steps any other franchise applicant would have to complete. Therefore, Plaintiffs have failed to show that the alleged misrepresentations made by Ms. Robinson were the proximate cause of any damages they suffered.

The evidence shows Mr. Luther had considerable experience in the automobile dealership arena; he had owned a Ford dealership since at least 1996 and a Chrysler-Dodge-Jeep dealership since at least early 2006. (Defendant's Response, Doc. No. 91, Exhibit 1, Luther Depo. at 15-16.)  He also had experience in applying for a dealership which was not awarded. (Def.'s App., Luther Depo. at 22.)  In sum, a reasonable and experienced businessman such as Mr. Luther would have understood that being chosen to complete the full dealer package, much less the preliminary application, did not guarantee he would be awarded the franchise. Thus, even if we accept Mr. Luther's testimony that Ms. Robinson told him Plaintiffs "were the people that were going to be the Kia franchise in this market area," a reasonable automobile dealer would have understood that receiving the Kia franchise hinged on successful completion of

22

the dealer package.  To apply any other interpretation to Ms.
Robinson's statement would lead to the illogical conclusion that
completing the extensive and complex dealer package, plus making
the substantial financial commitments required, were themselves
mere formalities.

Defendant's motion for summary judgment on the negligent
misrepresentation claims in Counts III and IV is granted.

C.   <u>Count V - Detrimental Reliance/Promissory Estoppel</u>

Defendant last argues that Plaintiffs' claims for
detrimental reliance/promissory estoppel must fail because they
cannot establish that (1) Kia made any promises to Plaintiffs or
(2) even if such promises were made, their reliance would be
unreasonable as a matter of law or (3) the terms of the promises
were too indefinite.  And again, Kia argues that the only entity to
have suffered any damages or injustice was MCDL, Inc., rather than
Mr. Luther or Mario Luther, Inc.  (Def.'s Memo at 13-16.)

Plaintiffs argue that contrary to Defendant's position, they
did not take action solely in reliance on the oral promises made to
them.  Rather, Defendant made significant demands on them, e.g., to
form a new corporation, establish a Kia trade name, pay $15,000 for
Kia signs, submit the extensive dealer package, and undertake
numerous other commitments.  There was nothing vague or indefinite
about the promises that Mr. Luther would be granted a dealership
or, at the very least, his dealer package would be sent to the

23

national office for final approval.  Consequently, summary judgment

must be denied.  (Plfs.' Memo at 8-9.)

　　　　1.　*Applicable Law:*  To establish a promissory estoppel

claim under Pennsylvania law, the plaintiff must show that

1) 　the promisor made a promise that he should have
reasonably expected to induce action or forbearance
on the part of the promisee;

2) 　the promisee actually took action or refrained from
taking action in reliance on the promise; and

3) 　injustice can be avoided only by enforcing the
promise.

Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000); *see also*

Edwards v. Wyatt, 335 F.3d 261, 277 (3d Cir. 2003), *citing* Crouse,

id.  Promissory estoppel is "an equitable remedy to be implemented

only when there is no contract; it is not designed to protect

parties who do not adequately memorialize their contracts in

writing."  Iversen Baking Co. v. Weston Foods, 874 F.Supp. 96, 102

(E.D. Pa. 1995); *see also* Sullivan v. Chartwell Inv. Partners, LP,

873 A.2d 710, 717 (Pa. Super. Ct. 2005).

　　The elements of promissory estoppel are "(1) misleading words,

conduct or silence[8] by the party against whom the estoppel is

---

[8]　Although the Pennsylvania Supreme Court has not determined if
a promise inferred from a party's conduct or silence is sufficient to
establish promissory estoppel, the Third Circuit Court of Appeals has
concluded there can be no justifiable reliance without an express
promise.  See KSM Assocs. v. ACS State Healthcare, LLC, CA No. 05-
4118, 2006 U.S. Dist. LEXIS 28288, *5-*6 (E.D. Pa. May 11, 2006),
citing C & K Petroleum Prods., 839 F.2d 188, 192 (3d Cir. 1988)
(promissory estoppel would be "rendered meaningless" if a plaintiff
were allowed to maintain such an action based on the alleged existence
of "a broad and vague implied promise.")

asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel." Thomas v. E.B. Jermyn Lodge No. 2, 693 A.2d 974, 977 (Pa. Super. Ct. 1997).   These elements must be established by "clear and convincing evidence."  CONRAIL v. Foster Wheeler Envtl. Corp., CA Nos. 99-1642 and 99-1682, 2000 U.S. Dist. LEXIS 13477, *39 (E.D. Pa. Sept. 20, 2000) (citations omitted.)

To succeed on a promissory estoppel claim, the plaintiff must further establish that the action he took "amounted to a substantial change of position." Ankerstjerne v. Schlumberger Ltd., No. 04-2379, 2005 U.S. App. LEXIS 19154, *9 (3d Cir. Sept. 1, 2005), quoting Kaufman v. Mellon Nat'l Bank and Trust Co., 366 F.2d 326, 332 (3d Cir. 1996). A claim for estoppel cannot survive when the plaintiff's actions were based on "his own will and judgment" rather than the defendant's representations. Josephs v. Pizza Hut of America, Inc., 733 F.Supp. 222, 227 (W.D. Pa. 1989).

2.   *Discussion and Conclusion:* Let us assume – solely for purposes of discussion – that Ms. Robinson did expressly state to Mr. Luther that he would be awarded a Kia dealership in the Indiana/Blairsville market area or, at a minimum, his application package would be forwarded to Kia headquarters for consideration. Mr. Luther states that evidence of his reliance on these promises, plus Kia's subsequent demands, can be found in his efforts to form

25

a new corporation, establish a Kia trade name, pay $15,000 for Kia signs, and complete the dealer package. However, his argument must fail for two reasons.  First, Mr. Luther fails to allege in the Amended Complaint or to argue in his pleadings that he would not have taken those same actions had such promises not been made by Ms. Robinson.  Moreover, there is no clear and convincing evidence that he relied on those promises as compared to the general expectation that he might be awarded the dealership if he completed the Dealer Agreement as anticipated in the Kia Application. Second, Plaintiffs have failed to explain how their actions resulted in a "substantial change of position."  It is true that Kia required Plaintiffs to make extensive commitments in the course of completing the dealer package. However, Mr. Luther's check for the signage was returned (Def.'s App., Luther Depo. at 119-120) and there is no evidence that the time and money he spent pursuing the Kia dealership was diverted from some other business effort.

We find the facts of this case similar to those of <u>Josephs v. Pizza Hut of America, Inc.</u>, *supra.*  In that case, the plaintiffs purchased a building in the expectation that Pizza Hut would lease part of the building to open an outlet.  The plaintiffs alleged that Pizza Hut's agent, Cascarina, had promised to lease the space and represented to them that corporate approval was "only a mere formality."  After the plaintiffs closed on the property, Pizza Hut officials rejected the lease.  In granting summary judgment in

26

favor of the defendant on the promissory estoppel claim, the court noted that the plaintiffs had failed to show that their reliance on Cascarina's oral statements was reasonable.  The plaintiffs were experienced business owners who were represented by legal counsel during the process.  Despite a letter from Cascarina stating that approval could not be guaranteed, they unreasonably chose instead to rely on his oral statements and advice from their legal counsel and lender that the lease would be approved.  *See also* <u>Burton Imaging Group v. Toys "r" Us, Inc.</u>, 502 F. Supp.2d 434, 440 (E.D. Pa. 2007) (reliance on statement by the defendant's agent that "we're going to move ahead with you as long as everything that you're doing passes the Revolution Power Test," was unreasonable as a matter of law, inasmuch as the plaintiff relied "solely on its own judgment in determining the legal effect of the statement.")

While we recognize that determining whether reliance on a representation is reasonable or justifiable is generally a question of fact for the jury, for a sophisticated businessman to rely on an oral promise in light of the clear written terms of the Kia Application is unreasonable as a matter of law.  *See* <u>Huu Nam Tran v. Metro. Life Ins. Co.</u>, 408 F.3d 130, 135, 139 (3d Cir. 2005) (in determining reasonableness, the court must consider "the relationship of the parties involved and the nature of the transaction"); <u>Porreco v. Porreco</u>, 811 A.2d 566, 571 (Pa. 2002) (for reliance to be considered justifiable, it must be reasonable

27

to rely on the representation of another and where the party
claiming reliance has the opportunity to verify the truthfulness of
the statements, the court will hesitate to find reliance
justified.) Here, like the plaintiffs in <u>Josephs</u>, Mr. Luther is a
businessman with at least 12 years' experience as the owner of
automobile dealerships.  "It is not reasonable for experienced
business people to make business decisions based on oral
representations in contravention of written statements." <u>Blue Mt.</u>
<u>Mushroom Co. v. Monterey Mushroom</u>, 246 F. Supp.2d 394, 406 (E.D.
Pa. 2005), *citing* <u>Josephs</u>, 733 F.Supp. at 227; *see also* <u>Greenberg</u>
<u>v. Tomlin</u>, 816 F.Supp. 1039, 1056 (E.D. Pa. 1993) ("the degree of
sophistication of the parties and the history, if any, behind the
negotiation process are relevant factors in ascertaining
reasonableness.")  At the very beginning of the process, in June
2007, Mr. Luther signed a document stating he understood completion
of the application did not imply Kia's approval, that applying for
a franchise did not obligate Kia to enter into a Dealer Agreement,
that Kia could accept or reject the application at its sole
discretion and that any "actions taken, expenditures made, or
commitments assumed" were at his "sole risk and responsibility."
(Kia Application, ¶¶ 1-4, 7.)  Even if this document itself is not
deemed to be a contract, it is comparable to the letter from Pizza
Hut's representative in that it clearly contradicts the content of
the alleged oral promises.

"Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805 (1999), *quoting* Celotex, 477 U.S. at 322. Because Plaintiffs have failed to establish by clear and convincing evidence that their reliance on the alleged oral promises was justifiable and that they substantially changed their position in reliance on the promises, summary judgment is granted in favor of Kia on the promissory estoppel claims.

An appropriate Order follows.

December ___17___, 2009        _William L. Standish_
                                William L. Standish
                                United States District Judge

29